UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
G & G CLOSED CIRCUIT EVENTS, LLC,

                    Plaintiff,

                                                                **REPORT AND**
                                                                **RECOMMENDATION**
          - against -                                           22 CV 3248 (FB) (CLP)

WILLIAM R. ALBA, individually and d/b/a
HANGAR 11 BURGERS & BREWS a/k/a
HANGAR 11 BAR & GRILL; WILLIAM L.
ALBA, individually and d/b/a HANGAR 11
BURGERS & BREWS a/k/a HANGAR 11
BAR & GRILL; and DON KEW, INC., an
unknown business entity d/b/a HANGAR 11
BURGERS & BREWS A/K/A HANGAR 11
BAR & GRILL,
                    Defendants.
-------------------------------------------------------X

         On June 2, 2022, G & G Closed Circuit Events, LLC ("plaintiff" or "G & G")

commenced this suit against William R. Alba, individually, and d/b/a Hangar 11 Burgers &

Brews a/k/a/ Hangar 11 Bar & Grill ("R. Alba"), William L. Alba, individually, and d/b/a

Hanger 11 Burgers & Brews, a/k/a Hangar 11 Bar & Grill ("L Alba"), and Don Kew Inc., an

unknown business entity, d/b/a Hangar 11 Burgers & Brews a/k/a Hangar 11 Bar & Grill ("Don

Kew") (collectively, "defendants"), alleging violations of 47 U.S.C. §§ 605 and 553.  (Compl.[1])

         Despite being properly served with a Summons and Complaint,[2] defendants failed to

answer or respond to the Complaint.  On August 2, 2022, the Clerk of Court entered a default

against the defendants.  (ECF No. 9).  Currently pending on referral from the Honorable Judge

Frederic Block, U.S. District Judge, is plaintiff's motion for default judgment.

---

[1] Citations to "Compl." refer to plaintiff's Complaint filed on June 2, 2022.  (ECF No. 1)
[2] According to the affidavits of service, on June 14, 2022, defendant Don Kew was served through the New York Secretary of State (ECF No. 5); on June 28, 2022, defendant R. Alba was served personally (ECF No. 6); and on June 28, 2022, defendant L. Alba was served personally.  (ECF No. 7).

1

For the foregoing reasons, this Court respectfully recommends that, pursuant to 47 U.S.C. §§ 605(e)(3)(C)(i)(II), 605(e)(3)(C)(ii), and 605(e)(3)(B)(iii), plaintiff be awarded $1,400 in statutory damages and $2,800 in enhanced damages. The Court also recommends that the individual defendants, R. Alba and L. Alba, be held liable for the statutory violation.

<u>FACTUAL BACKGROUND</u>

In the Complaint, plaintiff alleges that it entered into a Master Services Agreement with DAZN Limited, through which the plaintiff was granted exclusive nationwide commercial distribution rights to the November 2, 2019, WBO Light Heavyweight Championship Fight Program, between Saul Alvarez ("Alvarez") and Sergey Kovalev ("Kovalev"), including undercard and preliminary bouts (collectively, the "Program"). (Compl. ¶ 18; MSA[3]). Plaintiff G & G entered into sublicensing agreements with various business entities throughout North America, and it subsequently granted these entities the rights to exhibit the Program at their respective commercial establishments for a fee based upon the establishment's capacity. (Compl. ¶ 19; Rate Card[4]).

According to plaintiff, the Program could only be exhibited in a commercial establishment if the establishment had entered into a sublicensing agreement and was authorized to display the Program by plaintiff. (Pl.'s Mem.[5] at 2; Compl. ¶ 20). To prevent unauthorized interception or receipt of the Program, the interstate satellite transmission of the Program was electronically coded or "scrambled." (Compl. ¶ 23). The Program was transmitted "via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies via satellite

---

[3] Citations to the "MSA" refer to the Master Services Agreement, entered into between DAZN Limited and G & G, attached as Exhibit A to the Complaint. (ECF No. 1 at 13–15).
[4] Citations to "Rate Card" refer to plaintiff's "Rate Card for November 2nd Alavrez vs. Kovalev," attached to the MSA and Complaint. (ECF No. 1 at 16).
[5] Citations to "Pl.'s Mem." refer to Plaintiff's Memorandum in Support of its Application for Default Judgment, filed on October 27, 2022. (ECF No. 10-2).

signal." (Id.)  Thus, to gain access to the encrypted interstate satellite transmission of the Program, the authorized, commercial establishment would be "provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal, or the establishment's satellite or cable provider would be notified to unscramble the reception of the [Program] for the establishment, depending upon the establishment's equipment and provider." (Id. ¶ 24; see also Gagliardi Aff.[6] ¶ 11).  Plaintiff asserts that it is because of this encryption or scrambling that its programming cannot be "mistakenly, innocently, or accidentally" intercepted. (Gagliardi Aff. ¶ 9).[7]

Plaintiff alleges that the individual defendants are owners of defendant Don Kew, Inc., which is a New York Corporation that owns and operates the commercial establishment Hangar 11 Burgers & Brews a/k/a Hangar 11 Bar & Grill ("Hangar 11"), located at 11911 Metropolitan Avenue, Kew Gardens, NY 11415.  (Compl. ¶¶ 7–10).  On November 3, 2019, at approximately 12:40 a.m., Ashley Santangelo ("Santangelo"), an investigator with Remote Risk Management, paid a cover charge of $20 to enter Hangar 11.  (Santangelo Aff.[8]).[9]  She represents that upon her arrival at 12:40 a.m., she observed on the television the two fighters – Alvarez, in yellow and blue trunks, and Kovalev, in black and red trunks – preparing for the fight live on DAZN.  (Id.)  Inside, Santangelo observed the Program being broadcast to patrons on 21 screens, and she

---

[6] Citations to "Gagliardi Aff." refer to the Affidavit of Nicholas J. Gagliardi, President of G & G Sports Productions, Inc., dated October 25, 2022.  (ECF No. 10-3).

[7] Plaintiff provides several examples of how a Program could be unlawfully intercepted such as purchasing a "blackbox" or "smartcard" that would descramble the reception, misrepresenting that the commercial establishment was a residential establishment, or the use of other "illegal unencryption devices."  (Gagliardi Aff. ¶ 10).

[8] Citations to "Santangelo Aff." refer to the Affidavit of Ashley Santangelo, Investigator for Plaintiff, dated November 3, 2019, and submitted as Exhibit 5 to the Declaration of Plaintiff's Counsel Joseph P. Loughlin in Support of Application for Default Judgment by the Court. ("Loughlin Decl.," ECF No. 10-1).

[9] In her Affidavit, Santangelo writes that she arrived at 12:40 a.m. on "November 2, 2019" and left at 1:00 a.m. on November 3, 2019.  (Santangelo Aff.).  Presumably, the investigator did not spend over 24 hours in the bar.  The Court presumes that the first date is a typographical error and that the investigator arrived at Hangar 11 at 12:40 a.m. on November 3, 2019.  While the date of the Program on the MSA and Rate card is listed as "November 2, 2019," it makes sense to the Court that Santangelo observed the fight in the early hours of November 3, 2019 in New York when the fight took place in Nevada.  (See MSA at 1).

observed that Hangar 11 had a capacity of approximately 100 people with between 75 and 85 people in attendance that night. (Id.; see also Compl. ¶ 25). Based on these observations and based on the rate card for an establishment with a capacity of 100 patrons, plaintiff estimates that the commercial sublicense fee for this establishment should have been $1,400. (Compl. ¶ 27; Rate Card). However, according to plaintiff, none of the defendants paid such a fee to plaintiff. (Compl. ¶ 27).

DISCUSSION

I.    Default Judgment

    A.   Legal Standard

Rule 55 of the Federal Rules of Civil Procedure sets forth a two-step process for the entry of a default judgment. See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95–96 (2d Cir. 1993). First, the Clerk of Court enters the default pursuant to Rule 55(a) by notation of the party's default on the Clerk's record of the case. See id.; see also Fed. R. Civ. P. 55(a) (providing that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default"). Second, after the Clerk of Court enters a default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the court may enter a default judgment. See Fed. R. Civ. P. 55(b). Where the amount of damages owed requires a judicial finding, a default judgment may be entered once the court has conducted a hearing or made a referral to determine the question of damages. See Fed. R. Civ. P. 55(b)(2).

Providing guidance as to when a default judgment is appropriate, the Second Circuit has cautioned that since a default judgment is an extreme remedy, it should only be entered as a last resort. See Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not

4

processed expeditiously [and] . . . delay and clog its calendar," it has held that the district court must balance that interest with its responsibility to "[afford] litigants a reasonable chance to be heard." Enron Oil Corp. v. Diakuhara, 10 F.3d at 95–96.  Thus, in light of the "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored," and doubts should be resolved in favor of the defaulting party.  Id.  Furthermore, "[Rule] 55(b) states that a judgment by default 'may' be entered under specified circumstances, not that it must."  See Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice").  Accordingly, a plaintiff is not entitled to a default judgment as a matter of right simply because a defendant is in default.

The Court has significant discretion to consider several factors in deciding whether to grant a default judgment, including:  (1) whether the claims were adequately pleaded in the Complaint, thereby placing the defendant on notice, see Fed. R. Civ. P. 54(c) (stating:  "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings"); cf. King v. STL Consulting, LLC, No. 05 CV 2719, 2006 WL 3335115, at *4-5 (E.D.N.Y. Oct. 3, 2006) (holding that Rule 54(c) is not violated in awarding damages that accrued during the pendency of a litigation, so long as the complaint put the defendant on notice that the plaintiff may seek such damages), adopting report and recommendation adopted, id. at *1–9; (2) "'whether the grounds for default are clearly established;'" and (3) "'the amount of money potentially involved.'"  Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992) (quoting 10 Charles A. Wright, et al., Federal Practice and Procedure § 2685, at 423, 425–26 (2d ed. 1983)).  The more money involved, the less justification for entering the default judgment.  Id.

Additionally, "'the Court may consider whether material issues of fact remain, whether the facts alleged in the complaint state a valid cause of action, whether plaintiff has been substantially prejudiced by the delay involved, and whether the default judgment may have a harsh effect on the defendant.'" Pacific M. Int'l Corp. v. Raman Int'l Gems, Ltd., 888 F. Supp. 2d 385, 393 (S.D.N.Y. 2012) (quoting Stein v. Valentine & Kebartas, Inc., No. 10 CV 2465, 2012 WL 1416924, at *2 (E.D.N.Y. Mar. 15, 2012)), adopting report and recommendation, id. at 389–404; see also Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981) (explaining that under Fed. R. Civ. P. 55(b)(2) "a district court has discretion . . . to require proof of necessary facts and need not agree that the alleged facts constitute a valid cause of action"); 10A Charles A. Wright, et al., Federal Practice and Procedure § 2685 (4th ed. 2008) (Apr. 2023 update) (discussing the aforementioned factors).

The burden is on the plaintiff to establish his entitlement to recovery. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993). When a default judgment is entered, the defendant is deemed to have admitted all well-pleaded allegations in the complaint pertaining to liability, but not as to damages. Id. Thus, for the purposes of an inquest, the court "accept[s] as true all of the factual allegations in the complaint, except those claims relating to damages," and the plaintiff is "entitled to all reasonable inferences from the evidence offered." Au Bon Pain Corp. v. Artect, Inc., 653 F.2d at 65. While "the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing;" instead, "the court may rely on detailed affidavits or documentary evidence." Fustok v. Conticommodity Servs., Inc., 122 F.R.D. 151, 156 (S.D.N.Y. 1988) (collecting cases), aff'd, 873 F.2d 38 (2d Cir. 1989).

6

In this case, it is beyond dispute that the defendant is in default since it has failed to appear in this action, respond to the Complaint, or contest this motion for default judgment.  See Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *1–2 (holding that defendant's default was "crystal clear" when it failed to oppose the plaintiff's motion for an entry of default after "fail[ing] to submit an answer or otherwise respond to the complaint").  On April 18, 2023, this Court issued an Order inviting defendants to submit papers in response to plaintiff's motion by May 19, 2023, or to request a hearing, and Ordered plaintiff to serve the Court's Order on defendant.  (ECF No. 11).  On April 21, 2023, plaintiff filed a certificate of service indicating that it had served all defendants with a copy of this Court's Order.  (ECF No. 12).

Notwithstanding the Court's April 18, 2023 Order, defendants failed to file any papers and did not contact the Court to request a hearing.  Moreover, Don Kew, a corporate entity, has failed to retain counsel or otherwise defend itself in this matter.  See La Barbera v. Federal Metal & Glass Corp., 666 F. Supp. 2d 341, 348 (E.D.N.Y. 2009) (holding "a failure to obtain counsel constitutes a failure to defend because corporations cannot proceed in federal court *pro se*") (citing Shapiro, Bernstein & Co. v. Continental Record Co., 386 F.2d 426, 427 (2d Cir. 1967) (per curiam), and Jones v. Niagara Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir. 1983)), adopting report and recommendation, id. at 345–56.  Accordingly in light of the defendants' apparent lack of interest in participating in these proceedings, the Court proceeds to consider plaintiff's motion for default judgment.[10]

---

[10] It should also be noted that the amount of money involved in this case is not great.  Therefore, unlike cases with millions of dollars potentially at stake, here, the Court does not hesitate before entering default judgment.  See Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *2 (declining to enter default judgment, in part because plaintiff's damages request ran "well into the millions of dollars," and giving defendant an opportunity to contest the entry of default).

7

B. <u>Entry of Default Judgment</u>

Plaintiff alleges that the defendants violated 47 U.S.C. §§ 553(a)(1)[11] and 605(a) through the unauthorized reception of plaintiff's satellite communications.  However, a court is not permitted to grant damages under both statutes for a single illegal transmission.  <u>See</u> <u>International Cablevision, Inc. v. Sykes</u>, 997 F.2d 998, 1008–09 (2d Cir. 1993).  Rather, the Second Circuit has stated that where a defendant is found to have violated both statutes, the court should award damages pursuant to Section 605.  <u>Id.</u>; <u>see also</u> <u>Garden City Boxing Club, Inc. v. Polanco</u>, No. 05 CV 3411, 2006 WL 305458, at *5 (S.D.N.Y. Feb. 7, 2006), <u>aff'd</u>, 228 F. App'x 29 (2d Cir. 2007).  Since plaintiff only seeks damages under Section 605 (Pl.'s Mem. at 4), the Court has considered plaintiff's request for damages only under Section 605.

B.     <u>Corporate Defendant's Liability</u>

Here, it is clear that the allegations in the Complaint establish the elements of liability necessary to state a claim under Section 605.  Section 605(a), which provides that "[n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the . . . contents . . . of such intercepted communication to any person," 47 U.S.C. § 605(a), has been held to apply to the interception of cable communications originating as a satellite or radio transmission.  <u>See</u> <u>International Cablevision, Inc. v. Sykes</u>, 75 F.3d 123, 131–32 (2d Cir. 1996), <u>cert. denied</u>, 519 U.S. 929 (1996); <u>see also</u> <u>J & J Sports Prods., Inc. v. Peroles LLC</u>, No. 18 CV 243, 2019 WL 13124297, at *3 (D. Conn. Jan. 18, 2019); <u>Garden City Boxing Club, Inc. v. Polanco</u>, 2006 WL 305458, at *4; <u>Entertainment by J & J, Inc. v. Mama Zee Rest. & Catering Servs., Inc.</u>, No. 01 CV 3945, 2002 WL 2022522, at *2 (E.D.N.Y. May 21, 2002),

---

[11] Section 553(a)(1) provides, in pertinent part, "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law."  47 U.S.C. § 553(a)(1).

report and recommendation adopted, (E.D.N.Y. June 24, 2002).  To establish a claim under §

605, plaintiff must demonstrate that defendants received or published the content without

authorization and that plaintiff held "'proprietary rights in the intercepted communication.'"  J &

J Sports Prods., Inc. v. Peroles LLC, 2019 WL 13124297, at *3 (quoting 47 U.S.C. § 605). Here,

Don Kew's alleged conduct – the unauthorized interception, receipt, and transmission of the

Program, which originated via satellite uplink, at Hangar 11 for which plaintiff had the

exclusive, commercial distribution rights thereto – violates this statute.  (Compl. ¶¶ 18, 23, 25,

27, 29, 30).  Accordingly, the Court respectfully recommends that Don Kew be found liable for

violating Section 605.

C.      Individual Defendants' Liability

        Plaintiff also seeks to hold the individual defendants L. Alba and R. Alba individually

liable for the violations of Section 605 that occurred at Hangar 11.  Individuals may be held

liable for violations of Section 605 that occur at their establishments under two theories:

vicarious liability and contributory liability.  See J & J Sports Prods., Inc. v. Guncay, No. 18 CV

2097, 2018 WL 6313210, at *2 (E.D.N.Y. Oct. 17, 2018), report and recommendation adopted,

2018 WL 6308773 (E.D.N.Y. Dec. 3, 2018).  A plaintiff can establish that individual defendants

are vicariously liable by demonstrating that defendants "had a 'right and ability to supervise that

coalesced with an obvious and direct financial interest in the exploitation of copyrighted

materials.'"  Id. (quoting Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc., 118 F.3d 955, 971

(2d Cir. 1997)).  A plaintiff can establish that individual defendants are liable for their

contributory infringement when they "'authorized the infringing use.'"  Id. (quoting Softel, Inc.

v. Dragon Med. & Sci. Commc'ns, Inc., 118 F.3d at 971).

Here, the Complaint includes sufficient allegations to establish that the individual defendants are vicariously liable and therefore, the Court does not pass on whether the individual defendants are also contributorily liable. See id. at *3 (explaining that "[b]ecause I find that [the individual defendant] is vicariously liable for the unlawful interception of the program, it is not necessary to address plaintiff's contributory infringement claim"). To find the individual defendants vicariously liable, plaintiff must show that the defendants benefitted from the unauthorized reception of the Program through a showing of "direct financial gain, such as a cover charge on the night of the event" or "strong indirect evidence of financial gain, such as a bar hosting a large number of patrons, who would presumably purchase drinks during the broadcast." J & J Sports Prods., Inc. v. LX Food Grocery Inc., No. 15 CV 6505, 2016 WL 6905946, at *3 (E.D.N.Y. Nov. 23, 2016); see, e.g., J & J Sports Prods., Inc. v. McAdam, No. 14 CV 5461, 2015 WL 8483362, at *2–3 (E.D.N.Y. Dec. 9, 2015) (finding individual defendants vicariously liable where the infringing content was broadcast on five televisions, the establishment charged a $20 cover charge, and the establishment had approximately 100 patrons); J & J Sports Prods. v. Tellez, No. 11 CV 2823, 2011 WL 6371521, at *3–4 (E.D.N.Y. Dec. 20, 2011) (finding the individual defendant vicariously liable where 85 patrons were present watching the infringing content in a bar); see also Joe Hand Promotions, Inc. v. Beer Closet, Inc., No. 17 CV 3735, 2018 WL 4138938, at *2, 5 (E.D.N.Y. July 26, 2018) (finding individual defendants vicariously liable where they advertised their broadcast of the infringing content, one television broadcast the event, and 35 patrons were present at the time), report and recommendation adopted, 2018 WL 4119548 (E.D.N.Y. Aug. 24, 2018).[12]

---

[12] Some courts have found that similar allegations were insufficient to hold an individual defendant vicariously liable. See, e.g., J & J Sports Prods., Inc. v. Daley, No. 06 CV 238, 2007 WL 7135707, at *3–4 (E.D.N.Y. Feb. 15, 2007), report and recommendation adopted, (E.D.N.Y. Mar. 19, 2007). Here, however, given the factual allegations

In this case, plaintiff alleges that L. Alba and R. Alba, as owners and operators of Don Kew and Hangar 11, had the right and obligation "to supervise the activities of Hangar 11 . . . , which included the unlawful interception, receipt and publication of Plaintiff's [Program]." (Compl. ¶¶ 9–12). Plaintiff also alleges that L. Alba and R. Alba "had an obvious and direct financial interest in the activities of Hangar 11 . . . , which included the unlawful interception, receipt and publication of Plaintiff's [Program]" and which "resulted in increased profits or financial benefit to Hangar 11." (Id. ¶¶ 14, 15). Courts in this district have found similar allegations sufficient to establish individual liability under Section 605. See J & J Sports Prods., Inc. v. 1400 Forest Ave Rest. Corp., No. 13 CV 4299, 2014 WL 4467774, at *6 (E.D.N.Y. Sept. 10, 2014), adopting report and recommendation, id. at *1–12; J & J Sports Prods., Inc. v. Mangos Steakhouse & Bakery, Inc., 13 CV 5068, 2014 WL 2879868, at *5 (E.D.N.Y. May 7, 2014), report & recommendation adopted, 2014 WL 2879890 (E.D.N.Y. June 23, 2014); Joe Hand Promotions, Inc. v. Elmore, No. 11 CV 3761, 2013 WL 2352855, at *5 (E.D.N.Y. May 29, 2013); J & J Sports Prods., Inc. v. Tellez, 2011 WL 6371521, at *3−4; J & J Sports Prods., Inc. v. Shafik, No. 10 CV 3809, 2011 WL 1240559, at *2 (E.D.N.Y. Feb. 11, 2011), report and recommendation adopted, 2011 WL 1218343 (E.D.N.Y. Mar. 30, 2011). Additionally, plaintiff provides further evidence of the individual's financial interest by alleging that the Program was broadcast on 21 different screens in the establishment, there were 75 to 85 people in the establishment, and alcoholic and non-alcoholic beverages were sold to patrons. (Compl. ¶¶ 25, 26).[13]

---

in the Complaint, the Court finds that plaintiff has sufficiently alleged liability on the part of the individual defendants.

[13] Although not mentioned in the Complaint, according to the Affidavit of Investigator Santangelo, Hangar 11 charged a $20 cover charge on the night of its broadcast of the Program. (Santangelo Aff.).

Accordingly, the Court respectfully recommends that the individual defendants William

L. Alba and William R. Alba be held jointly and severally liable with Don Kew Inc.

D.    <u>Damages</u>

Unlike allegations pertaining to liability, allegations in connection with damages are not

deemed admitted in the context of a default judgment.  <u>See</u> <u>Greyhound Exhibitgroup, Inc. v.</u>

<u>E.L.U.L. Realty Corp.</u>, 973 F.2d at 158.  Here, plaintiff requests an award of $4,200 in statutory

damages and $12,600 in enhanced statutory damages.  (Pl.'s Mem. at 5).  Plaintiff also requests

pre- and postjudgment interest at the federal statutory rate.  (<u>Id.</u> at 5 n.2).  Additionally, Plaintiff

seeks attorneys' fees and relevant costs but requests that it "be granted 30 days from the date the

judgment becomes final to submit its Motion for costs and attorneys' fees."  (<u>Id.</u> at 11).

1.  <u>Statutory Damages</u>

Where, as here, a violation of Section 605 has occurred, plaintiff is entitled to elect

statutory or actual damages.  47 U.S.C. § 605(e)(3)(C)(i).  In this instance, plaintiff has elected to

recover statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II).  (Pl.'s Mem. at 5; <u>see</u>

Gagliardi Aff. ¶ 14).[14]  Section 605 provides for penalties "for each violation of subsection (a) . .

. in a sum of not less than $1,000 or more than $10,000, as the court considers just."  47 U.S.C. §

605(e)(3)(C)(i)(II).  Although Section 605 requires the court to assess damages based on each

"violation" of the statute, there is no statutory definition of "violation."  <u>See</u> <u>Garden City Boxing</u>

<u>Club, Inc. v. Rosado</u>, No. 05 CV 1037, 2005 WL 3018704, at *3 (E.D.N.Y. Oct. 6, 2005), <u>report</u>

---

[14] As noted above, <u>see</u> discussion <u>supra</u> at 8, a plaintiff may only recover damages under one statute when there is a single illegal transmission.  <u>See</u> <u>International Cablevision, Inc. v. Sykes</u>, 997 F.2d at 1008–09.  Therefore, in accordance with Second Circuit precedent and plaintiff's request that the Court award damages under Section 605 (Pl.'s Mem. at 4), the Court recommends that plaintiff receive an award of damages pursuant to Section 605.  <u>See</u> <u>International Cablevision, Inc. v. Sykes</u>, 997 F.2d at 1009; <u>see also</u> <u>Garden City Boxing Club, Inc. v. Polanco</u>, 2006 WL 305458, at *5.

and recommendation adopted, (E.D.N.Y. Nov. 9, 2005).  Moreover, in cases such as this, involving the theft of services by a commercial establishment, it is often difficult to assess a precise figure.  However, most cases applying this statute in a commercial context have interpreted the showing of a single event on a single night as one violation.  See, e.g., id.; Time Warner Cable of N.Y.C. v. Taco Rapido Rest., 988 F. Supp. 107, 111 (E.D.N.Y. 1997), adopting report and recommendation, id. at 109–12.

In determining the amount of damages that may be imposed for each violation within the range of $1,000 to $10,000 per violation, Section 605 leaves the decision within the sound discretion of the court.  See 47 U.S.C. § 605(e)(3)(C)(i)(II); see also Time Warner Cable of N.Y.C. v. Taco Rapido Rest., 988 F. Supp. at 111.  The factors to be considered in determining the appropriate amount of damages include the "'pecuniary loss sustained by the victim as a result of the offense, the financial resources of the defendant, . . . the financial needs and earning ability of the defendant . . . as well as the burden that a damage award would impose on the defendant relative to the burden alternative relief would impose.'"  Cablevision Sys. Corp. v. De Palma, No. 87 CV 3528, 1989 WL 8165, at *6 (E.D.N.Y. Jan. 17, 1989) (quoting Cablevision Sys. Dev. Co. v. Cohen, No. 84 CV 115, slip op. at 4–5 (E.D.N.Y. May 20, 1988)); see also J & J Sports Prods., Inc. v. Mangos Steakhouse & Bakery, 2014 WL 2879868, at *6; Entertainment by J & J, Inc. v. Ramsarran, No. 01 CV 5223, 2002 WL 720480, at *2 (E.D.N.Y. Mar. 11, 2002).

In calculating lost profits, some courts have awarded a flat damage amount when considering the unauthorized receipt and broadcast of a cable program by a commercial establishment.  See, e.g., Joe Hand Promotions, Inc. v. Batista, 2021 WL 3855315, at *7–8 (explaining that the first approach to statutory damages in Section 605 cases is "'to award a flat sum, based on plaintiff's submitted evidence as to the amount of the license fee that the

13

particular establishment, given its size, would have had to pay to secure the rights to the broadcast in question'") (quoting J &J Sports Prods., Inc. v. Fantasy Bar & Rest. Corp., No. 17 CV 5355, 2018 WL 5018065, at *4 (S.D.N.Y. Sept. 20, 2018), report and recommendation adopted, 2018 WL 5016606 (S.D.N.Y. Oct. 15, 2018)); Kingvision Pay-Per-View Ltd. v. Rodriguez, No. 02 CV 7972, 2003 WL 548891, at *2 (S.D.N.Y. Feb. 25, 2003) (awarding the statutory minimum in damages where plaintiff failed to establish any actual damages because plaintiff did not submit evidence of the cost of the license fee for defendants to broadcast the boxing event); Cablevision Sys. Corp. v. Maxie's N. Shore Deli Corp., No. 88 CV 2834, 1991 WL 58350, at *2 (E.D.N.Y. Mar. 20, 1991) (awarding a flat damage amount "based on the Court's view of the equities and not the estimate of the number of patrons").

Other courts have assessed damages based on the number of patrons in the commercial establishment during the broadcast.  See, e.g., Garden City Boxing Club, Inc. v. Rosado, 2005 WL 3018704, at *3–4 (calculating the award based on the number of patrons present at the unauthorized broadcast multiplied by the residential charge for the pay-per-view event being shown, $54.95); Top Rank Inc. v. Tacos Mexicanos, No. 01 CV 5977, 2003 WL 21143072, at *4–5 (E.D.N.Y. Mar. 28, 2003) (awarding $50 per patron), adopting report and recommendation, id. at *1–6.  Still other courts in this district have calculated damages by multiplying the residential rate by the number of patrons present, and then adding that amount to the licensing fee.  See, e.g., J & J Sports Prods., Inc. v. Afrikan Poetry Theatre, Inc., No. 17 CV 2196, 2018 WL 2078482, at *8–9 (E.D.N.Y. Feb. 27, 2018), report and recommendation adopted, 2018 WL 1725692 (E.D.N.Y. Apr. 10, 2018); see also J & J Sports Prods., Inc. v. LDG Williams, LLC, No. 11 CV 2145, 2011 WL 5402031, at *4 (E.D.N.Y. Nov. 7, 2011).

In this case, plaintiff contends that "[t]he cost for the establishment to broadcast the Program lawfully was $1,400." (Pl.'s Mem. at 8 (citing the Rate Card, which indicates that plaintiff would have charged $1,400 to an establishment with a capacity of 1 to 100 to broadcast the Program); Gagliardi Aff. ¶ 8). Plaintiff does not provide the residential rate that would have been charged for this event. Apart from the actual damages that plaintiff has calculated, plaintiff also argues that signal piracy causes a reduction in plaintiff's lawful business because of the "perceived lack of significant consequences" for such behavior. (Gagliardi Aff. ¶ 13). Further, plaintiff argues that there is a "reasonable presumption" that defendants obtained additional profits as a result of the unauthorized broadcast of the Program, but "as this is a default case, Plaintiff cannot calculate the profits for the Defendant." (Pl.'s Mem. at 8). Plaintiff also contends that neither of the two typical methods of calculating damages should be used in this case, in part because such awards would fail to compensate plaintiff adequately and would create a "perverse incentive for an individual to attempt to break the law." (Id. at 8–9). For that reason, plaintiff requests statutory damages be awarded in the amount of $4,200, representing three times the licensing fee. (Id. at 8).

2.    Application

Here, plaintiff has alleged and has produced an affidavit from an investigator attesting to the fact that the establishment had a capacity of 100 and there were between 75 and 85 patrons in attendance while the Program was broadcast. (See Compl. ¶ 25; Santangelo Aff.). Plaintiff contends that it lost revenue equal to $1,400, based on the fee that would have been charged to a commercial establishment with a capacity of 1–100. (Pl.'s Mem. at 8). Awarding the plaintiff $1,400 in lost revenues constitutes an award greater than the statutory minimum of $1,000. See 47 U.S.C. § 605(e)(3)(C)(i)(II); Kingvision Pay-Per-View Ltd. v. Autar, 426 F. Supp. 2d 59, 63–

64 (E.D.N.Y. 2006) (awarding $1,000 where multiplying the number of patrons by $50 would lead to a total less than the statutory minimum).

In seeking three times the licensing fee, plaintiff cites a variety of cases outside this district and Circuit where courts have used this method. See, e.g., J & J Sports Prods., Inc. v. Tonita Rest., LLC, No. 13 CV 382, 2015 WL 9462975, at *4 (E.D. Ky. Dec. 28, 2015) (awarding three times the licensing fee); Joe Hand Promotions, Inc. v. Sheedy, No. 08 CV 1797, 2011 WL 4089534, at *4 (D.S.C. July 29, 2011) (recommending an award of five times the licensing fee), report and recommendation adopted, 2011 WL 4101273 (D.S.C. Sept. 13, 2011). Although the Court has reviewed these out-of-circuit cases cited by plaintiff, courts in the Second Circuit generally award statutory damages equivalent to the sublicensing fee of $1,400. (See Pl.'s Mem. at 8). Thus, consistent with the precedents in this Circuit, the Court respectfully recommends an award of $1,400 in statutory damages.

3.    Enhanced Damages

Plaintiff also seeks enhanced statutory damages in the amount of $12,600 pursuant to Section 605(e)(3)(C)(ii), which provides for additional awards of up to a maximum of $100,000 for all willful violations. (Pl.'s Mem. at 5). The statute permits enhanced damages where "the violation was committed willfully and for purposes of commercial advantage or private financial gain." Entertainment by J & J, Inc. v. Ramsarran, 2002 WL 720480, at *2 (awarding statutory damages of $5,000, increased by $10,000 for willfulness under 47 U.S.C. § 605(e)(3)(C)(ii), where defendants displayed a boxing match to 18 patrons); see also Joe Hand Promotions, Inc. v. Batista, 2021 WL 3855315, at *8–9 (awarding $20,100 as enhanced damages, which was triple the amount of statutory damages of $6,700, where this was not defendants' first time exhibiting a broadcast without authorization, defendants advertised the event, and they collected a cover

16

charge in the amount of $25); Time Warner Cable of N.Y.C. v. Taco Rapido Rest., 988 F. Supp. at 111–12 (awarding statutory damages of $3,750, increased by $5,000 for willfulness under section 605(e)(3)(C)(ii))). This section clearly applies to persons or entities that operate commercial establishments such as bars, taverns, and restaurants that exhibit unauthorized programming to their patrons. See, e.g., Entertainment by J & J, Inc. v. Ramsarran, 2002 WL 720480, at *2.

In determining whether an enhanced award for willful conduct is warranted, some precedents suggest that the simple fact the Program was intercepted and broadcast without permission is an indication of willfulness. See, e.g., J & J Sports Prods., Inc. v. Nest Rest. & Bar, Inc., No. 17 CV 2194, 2018 WL 4921657, at *8 (E.D.N.Y. July 17, 2018), report and recommendation adopted, 2018 WL 4356724 (E.D.N.Y. Sept. 12, 2018); J & J Sports Prods., Inc. v. Big Daddy's Theme Palace, No. 14 CV 2765, 2015 WL 58606, at *4 (E.D.N.Y. Jan. 5, 2015), adopting report and recommendation, at *1–6. "Willfulness means 'disregard for the governing statute and an indifference to its requirements.'" J & J Sports Prods., Inc. v. Big Daddy's Theme Palace, 2015 WL 58606, at *4 (quoting TransWorld Airlines, Inc. v. Thurston, 469 U.S. 111, 127 (1985)). [15] Courts also consider five factors to determine whether willful conduct warrants an award of enhanced damages: "'whether there is evidence of (i) repeated violations; (ii) significant actual damages suffered by the plaintiff; (iii) substantial unlawful monetary gains by defendant; (iv) defendant's advertising of the event; and (v) defendant's collection of a cover charge or premiums for food and drinks.'" See J & J Sports Prods., Inc. v.

---

[15] One court in this district has noted that it is conceivable that a small business owner could accidentally sign up for residential cable service or that an error on the part of a cable service provider could lead to a business being improperly categorized as a residence, thereby questioning whether a defendant only willingly violates Section 605. See J & J Sports Prods., Inc. v. Louisias, No. 06 CV 339, 2006 WL 1662608, at *4 (E.D.N.Y. May 16, 2006) (not reaching the question of willfulness because plaintiff failed to establish that the violation of Section 605 was made "for commercial advantage"), report and recommendation adopted, (E.D.N.Y. June 14, 2006).

LX Food Grocery Inc., 2016 WL 6905946, at *5 (quoting J & J Sports Prods. Inc. v. Big Daddy's Theme Place, Inc., 2015 WL 58606, at *5); see also J & J Sports Prods., Inc. v. Nest Rest. & Bar, Inc., 2018 WL 4921657, at *9 (collecting cases).

      In determining the enhanced damages for willful conduct, courts take varying approaches.  Some courts have awarded treble damages for willful violations.  See, e.g., Joe Hand Promotions, Inc. v. Batista, 2021 WL 3855315, at *8–9; J & J Sports Prods., Inc. v. Hot Shots, Inc., No. 09 CV 1884, 2010 WL 3522809, at *3 (E.D.N.Y. Apr. 27, 2010) (recommending plaintiff be awarded an enhancement of three times the statutory damages award of $2,747.50, or $8,242.50, for willfulness, for a total award of $10,990, report and recommendation adopted, 2010 WL 3523003 (E.D.N.Y. Sept. 2, 2010); J & J Sports Prods., Inc. v. Benson, 2007 WL 951872, at *5 (awarding statutory damages of $1,200, plus enhanced damages of $3,600, for a total of $4,800 where plaintiff did not advertise the event, charged no cover, and five patrons were present); J & J Sports Prods., Inc. v. Forbes, No. 07 CV 4394, 2008 WL 5263732, at *5–6 (E.D.N.Y. Dec. 17, 2008) (awarding $1,000 in statutory damages and $3,000 in enhanced statutory damages for willfulness, for a total of $4,000 where there was no evidence of a cover charge or repeated offenses), adopting report and recommendation, id. at *1–7.

      Other courts have awarded enhanced damages in an amount double the award of statutory damages, awarding plaintiff statutory damages plus two times that amount.  See, e.g., J & J Sports Prods., Inc. v. Onyx Dreams, Inc., No. 12 CV 5355, 2013 WL 6192546, at *6–7 (E.D.N.Y. Nov. 26, 2013) (awarding enhanced damages of $9,011.80, or two times the statutory damages of $4,505.90, for a total of $13,517.70, where defendant charged a cover fee of $20 and 82 patrons were in attendance), adopting report and recommendation, id. at *1–8; Joe Hand Promotions, Inc. v. Elmore, 2013 WL 2352855, at *8 (awarding $1,538.60 in statutory damages

plus two times that, $3,077.20, in enhanced damages, for a total award of $4,615.80); Garden City Boxing Club, Inc. v. 135 Hunt Station Billiard, Inc., No. 01 CV 3849, 2012 WL 4328355, at *5 (E.D.N.Y. June 21, 2012) (awarding $4,396 in enhanced damages, plus statutory damages of $2,198, where the violations were willful, there were 40 patrons in attendance, but there was no evidence of prior violations); J & J Sports Prods., Inc. v. Tellez, 2011 WL 6371521, at *6 (awarding $4,670.75 in statutory damages plus two times that amount, or $9,341.50, representing enhanced damages where plaintiff showed no evidence of prior violations and where the revenues defendant earned were unclear and defendants did not collect a cover charge).

Still other courts have simply awarded enhanced damages in an amount equal to the amount awarded for statutory damages.  See, e.g., J & J Sports Prods. Inc. v. Orellana, No. 18 CV 2052, 2019 WL 1177719, at *5–6 (S.D.N.Y. Mar. 13, 2019) (awarding statutory damages of $3,000 and enhanced damages of $3,000); J & J Sports Prods. Inc. v. Johnny's Rest., Bar & Lounge Inc., No. 15 CV 6645, 2016 WL 8254906, at *5–6 (E.D.N.Y. Dec. 15, 2016) (recommending an award of statutory damages of $3,297 and enhanced damages of $3,297), report and recommendation adopted, 2017 WL 591143 (E.D.N.Y. Feb. 13, 2017); J & J Sports Prods., Inc. v. LDG Williams, LLC, 2011 WL 5402031, at *4–5 (awarding statutory damages of $2,534.15 and enhanced damages of $2,534.15 for willfulness).

Finally, there are instances where courts have not awarded an enhancement.  See, e.g., J & J Sports Prods., Inc. v. Monte Limar Sports Bar, No. 15 CV 3771, 2017 WL 933079, at *4–5 (E.D.N.Y Mar. 8, 2017) (awarding $2,200 in statutory damages and zero in enhanced damaged because, although there were 100 patrons present, the court found no evidence of significant profit or commercial advantage); J & J Sports Prods., Inc. v. LX Food Grocery Inc., 2016 WL 6905946, at *4–5 (awarding $2,200 in statutory damages and zero in enhanced damages and

explaining that "discretionary enhanced damages should be reserved for particularly severe cases"); J & J Sports Prods., Inc. v. Martinez, No. 07 CV 3455, 2009 WL 1913239, at *2–3 (E.D.N.Y. June 30, 2009) (awarding $3,000 in statutory damages and zero enhanced damages for an establishment with 40 patrons where plaintiff failed to submit evidence or make specific allegations responsive to the aforementioned enhanced damages factors)), adopting report and recommendation, id. at *1–3.

Plaintiff alleges that defendants intercepted and broadcast the Program without entering into a licensing agreement with plaintiff or paying fees to plaintiff. (Compl. ¶ 27). To accomplish this, defendants could have utilized an unauthorized decoder, illegally transferred an authorized decoder to the location, illegally altered cable service to bring the signal to the defendant's establishment or misrepresented the commercial establishment as a residential property to allow purchase of the Program at the residential price. (See Gagliardi Aff. ¶ 10). As previously mentioned, the Program was broadcast on 21 screens at Hangar, to 75 to 85 patrons. (Santangelo Aff.; Compl. ¶ 25). According to the investigator, she was charged a $20 cover charge and purchased a drink; presumably other patrons were also charged a cover fee and purchased drinks. (Santangelo Aff.).

Plaintiff's evidence supports a finding that defendants' conduct was willful, as highlighted by the infringement itself and by the fact that the Program was broadcast on 21 different screens. Plaintiff's evidence also supports a finding that the Program was exhibited for commercial gain, as demonstrated by the collection of a cover charge and the sale of beverages that night. Plaintiff's undisputed allegations and supporting evidence in the form of affidavits warrant a finding that defendants' conduct was willful, and given that the plaintiff has identified

other factors that warrant enhancement, specifically a cover charge, the Court respectfully

recommends an additional award of $2,800 for the willfulness of this violation.

4.   Prejudgment Interest

Plaintiff also requests prejudgment interest at the federal statutory rate.  (Pl.'s Mem. at 5

n.2).  Section 605 does not provide a statutory basis for such an award of interest.  J & J Sports

Prods., Inc. v. Onyx Dreams Inc., 2013 WL 6192546, at *7.  The district court may nevertheless

choose to award pre-judgment interest.  See Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67

F.3d 1063, 1071–72 (2d Cir. 1995) (holding that "[t]he decision whether to grant prejudgment

interest and the rate used if such interest is granted 'are matters confided to the district court's

broad discretion'") (quoting Commercial Union Assurance, Co. v. Milken, 17 F.3d 608, 613–14

(2d Cir. 1994)); see also J & J Sports Prods., Inc. v. Onyx Dreams Inc., 2013 WL 6192546, at *7.

"The Second Circuit has recognized that pre-judgment interest may be permitted in the absence

of express statutory authorization 'when the awards were fair, equitable and necessary to

compensate the wronged party fully.'"  Garden City Boxing Club, Inc. v. Rojas, No. 05 CV

1047, 2006 WL 3388654, at *9 (E.D.N.Y. Nov. 21, 2006) (quoting Wickham Contracting Co.,

Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 955 F.2d 831, 835 (2d Cir. 1992)),

adopting report and recommendation, id. at *1–9.  However, pre-judgment interest is generally

awarded only in "'exceptional cases."  American Honda Motor Co., Inc. v. Two Wheel Corp.,

918 F.2d 1060, 1064 (2d Cir. 1990) (internal quotation marks omitted).

Plaintiff has not provided any reason for awarding pre-judgment interest under the

circumstances, and since the Court finds that plaintiff will be sufficiently compensated, the Court

respectfully recommends that pre-judgment interest not be awarded.

5.    Plaintiff's Attorneys' Fees & Costs

Pursuant to Section 605(e)(3)(B)(iii), plaintiff is also entitled to costs and reasonable attorneys' fees.  See 47 U.S.C. § 605(e)(3)(B)(iii) (stating that "[t]he court . . . shall direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails"); see also International Cablevision, Inc. v. Sykes, 997 F.2d at 1009.  Plaintiff requests "that it be granted 30 days from the date the judgment becomes final to submit its Motion for costs and attorneys' fees."  (Pl.'s Mem. at 11).  This practice of submitting a motion for fees and costs following the order of the district court has been accepted in this district.  See J & J Sports Prods., Inc. v. Reynolds, No. 18 CV 2540, 2019 WL 1299408, at *5 (E.D.N.Y. Jan. 11, 2019) (recommending that plaintiff be permitted to file a separate motion with attorneys' fees and costs within 30 days after the district judge's order on the report and recommendation), report and recommendation adopted, 2019 WL 1299665 (E.D.N.Y. Mar. 21, 2019); J & J Sports Prods., Inc. v. Guncay, 2018 WL 6313210, at *5 (same).

The Court therefore respectfully recommends that plaintiff be permitted to submit a motion for attorneys' fees, including an affidavit and contemporaneous time records establishing the amount of attorneys' fees and costs it seeks to recover,[16] 30 days from the date this Report and Recommendation is ruled upon.

6.    Postjudgment Interest

Finally, plaintiff also requests postjudgment interest at the federal statutory rate.  (Pl.'s Mem. at 5 n.2).  Pursuant to 28 U.S.C. § 1961, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court."  Under the statute, interest is calculated

---

[16] See J & J Sports Prods., Inc. v. Alvarez, No. 07 CV 8852, 2009 WL 3096074, at *7 (S.D.N.Y. Sept. 25, 2009) (declining to award plaintiff attorney's fees because of the failure to keep contemporaneous time records), adopting report and recommendation, id. at *1–7.

from the date of the entry of the judgment, at the weekly average 1-year constant maturity Treasury yield rate published by the Board of Governors of the Federal Reserve System for the preceding calendar week.  28 U.S.C. § 1961; see also Schipani v. McLeod, 541 F.3d 158, 165 (2d Cir. 2008) (noting that "postjudgment interest is governed by federal statute" and "an award of postjudgment interest is mandatory").  Accordingly, the Court recommends that the plaintiff be awarded postjudgment interest.

## CONCLUSION

Accordingly, this Court respectfully recommends that plaintiff be awarded $1,400 in statutory damages and $2,800 in enhanced damages from defendants for a total of $4,200.  The Court also respectfully recommends that plaintiff be permitted to submit a motion for attorneys' fees within 30 days from the date this Report and Recommendation is ruled upon.

Plaintiff is directed to serve a copy of this Report and Recommendation within **one week** and to provide the Court with proof of service.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); see also Fed. R. Civ. P. 6(a) (providing the method for computing time).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See, e.g., Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision") (quoting Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**.

Dated: Brooklyn, New York
   August 9, 2023

               _Cheryl L. Pollak_
               Cheryl L. Pollak
               United States Magistrate Judge
               Eastern District of New York